**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION**

ADRIAN JENKINS,

          Plaintiff,

    v.

JOSEPH HUTCHESON,

          Defendant.

CIVIL ACTION NO.: 6:14-cv-81

## ORDER and MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff filed a cause of action pursuant to 42 U.S.C. § 1983 on July 31, 2014, to contest certain conditions of his confinement while housed at Georgia State Prison in Reidsville, Georgia. (Doc. 1.) Defendant Joseph Hutcheson ("Defendant") filed a Motion for Summary Judgment. (Doc. 84.) Plaintiff filed a Response, (doc. 88), as well as a declaration in support of his Response (doc. 90).

For the reasons that follow, I **RECOMMEND** that the Court **GRANT in part and DENY in part** Defendant's Motion for Summary Judgment. The parties are **ORDERED** to file any Objections to this Report and Recommendation within fourteen (14) days from the date of its issuance.

## BACKGROUND[1]

This case revolves around four instances in which Defendant used force against Plaintiff on June 19, 2012, at Georgia State Prison ("GSP"). (Doc. 1.) The first instance of force occurred when Defendant escorted Plaintiff, who was handcuffed and restrained by chains, from

---

[1] The recited allegations are taken from Plaintiff's Complaint and are viewed in the light most favorable to Plaintiff, the non-moving party.

his cell in the G4 Building of GSP to his new cell in the G1 Building. (Doc. 1, p. 5.) When Plaintiff and Defendant arrived at the new cell, Plaintiff discovered that another inmate whom he considers an "enemy" was also housed in the cell. (Id. at p. 7.) Plaintiff then informed Defendant that he was concerned for his safety and did not wish to be placed in the cell. (Id.) Defendant ordered Plaintiff to enter the cell, and Plaintiff refused. (Id.) Plaintiff then turned his body away from the cell door and another officer pulled him back toward the cell door. (Doc. 84-3, p. 5.) After Plaintiff continued to tell the officers he would not enter the cell, Defendant pushed Plaintiff against a wall. (Doc. 1, p. 8.) Defendant then slammed Plaintiff's head against the concrete wall three times. (Id.) Following the third strike, Plaintiff sustained a gash to his forehead above his right eye. (Id.) Plaintiff maintains that, as a result, he now bears a one-inch scar on his forehead and experiences recurring migraines. (Id. at p. 10; Doc. 84-3, p. 10.) Defendant contends that he merely "placed [Plaintiff] against a wall" in order to secure him, but that "[i]t is possible that his head struck the wall" during the encounter. (Doc. 84-4, p. 2.)

The second instance of force occurred as Defendant, along with several other officers, escorted Plaintiff to the infirmary to treat the gash on his forehead. (Doc. 1, p. 10.) In his Declaration supporting his Motion for Summary Judgment, Defendant contends that Plaintiff spat on him during this escort.[2] Plaintiff denies spitting on Defendant and claims that Defendant maliciously ordered officers assisting the escort to knock Plaintiff to the floor and then had shackles placed around his ankles, had a mask strapped to his face, and had his handcuffs tightened. (Id.) Plaintiff claims Defendant then allowed other officers to kick, punch, and choke him. Plaintiff contends that the officers then dragged him down the hall to the infirmary. (Id. at

---

[2] Conversely, in his Statement of Material Facts, Defendant states that he "thought" Plaintiff had spat on him. (Doc. 84-2, p. 3.) In his brief supporting his Motion for Summary Judgment, Defendant avers that even if Plaintiff did not actually spit on him, "[t]hat does not mean that spittle from Plaintiff's verbal assault did not get on Sgt. Hutcheson." (Doc. 84-1, p. 18.)

p. 11.) Defendant does not deny that Plaintiff was kicked, punched, or choked after being restrained on the floor, but denies directing any officers to take such actions. (Doc. 84-4, p. 2.)

The third instance of force occurred as officers escorted Plaintiff back to his cell from the infirmary. Plaintiff claims that he was dragged down the hallway because the shackles on his ankles were so tight he could not walk. (Doc. 1, pp. 11–12.) As to both instances two and three, Defendant does not dispute that officers dragged Plaintiff to and from the infirmary, but contends that Plaintiff was dragged because he refused to walk. (Doc. 84-2, p. 5.)

The fourth instance of force alleged by Plaintiff concerns the nature in which he was handcuffed and shackled throughout the first three instances of force. Plaintiff contends that the handcuffs and shackles were placed upon him so tightly that he sustained lacerations on his wrists and ankles which caused massive swelling and has led to persisting numbness in his hands. (Doc. 1, p. 11.) Defendant avers that he checked Plaintiff's handcuffs and shackles and determined that they were not too tight and that, moreover, a nurse checked and twice confirmed that the restraints were not too tight. (Doc. 84-2, p. 5.)

Plaintiff maintains that each instance in which Defendant used force was unwarranted and excessive, (doc. 1, p. 14), while Defendant maintains that he employed only the amount of force necessary to address Plaintiff's noncompliance with his orders and to restore order in the prison (doc. 84-1, pp. 16–21).

Plaintiff first pursued his claims of excessive force through GSP's grievance process. The parties dispute the date on which Plaintiff filed his initial grievance, and thus, whether Plaintiff's Complaint in this Court was timely filed. Defendant contends that Plaintiff initiated the grievance process on June 28, 2012, (doc. 84-1, p. 5), whereas Plaintiff insists that he filed a grievance on June 19, 2012. The parties agree that Plaintiff received a response from the warden

on July 26, 2012 indicating that, due to the nature of his allegations, his grievance had been forwarded to the Internal Investigations Unit. (Doc. 84-5, p. 17.) The parties also agree that Plaintiff received no further communication from the Internal Investigations Unit regarding the status or resolution of his grievance. On April 14, 2014, Plaintiff filed his first Complaint addressing Defendant's use of force in this Court, which was dismissed without prejudice for Plaintiff's failure to return financial forms on May 29, 2014.[3] Plaintiff re-filed his Complaint on July 31, 2014.

After the requisite frivolity review, Plaintiff's Complaint was served against Defendant based upon Plaintiff's assertions that Defendant used an excessive amount of force against Plaintiff. (Doc. 10.) Defendant filed a Motion to Dismiss, contending that Plaintiff failed to timely file his Complaint within the applicable statute of limitations. (Doc. 24.) Magistrate Judge James E. Graham recommended that the Court deny Defendant's motion to dismiss, finding that Plaintiff had, at that stage, sufficiently alleged that he properly exhausted administrative remedies, which would toll the statute of limitations period. (Doc. 34, p. 6.) Adopting the Report and Recommendation of the Magistrate Judge as the opinion of the Court, Judge B. Avant Edenfield overruled Defendant's Objections and denied his Motion to Dismiss. (Doc. 42.) After a period of discovery, Defendant moved for summary judgment. (Doc. 84.) Defendant and Plaintiff have filed materials, respectively, in support of and in opposition to Defendant's Motion. (Docs. 84, 88.) In these materials, Defendant and Plaintiff give conflicting

---

[3] Seven days after the dismissal of his case, on June 5, 2014, Plaintiff filed a motion to amend or correct his complaint which was dismissed the same day. (Doc. 84-6, p. 2.) On June 6, 2014, Plaintiff filed a motion for reconsideration of the order dismissing his motion to amend or correct, which was denied. (Id.) Shortly thereafter, on July 1, 2014, Plaintiff filed a motion to appoint counsel and a motion for leave to proceed *in forma pauperis*, which was also dismissed. (Id.) Plaintiff then filed a notice of appeal on July 28, 2014, (id.), and filed the instant Complaint three days later.

accounts of the events of June 19, 2012 and disagree as to whether Plaintiff timely filed his Complaint.

## DISCUSSION

Defendant sets forth several grounds for summary judgment in his Motion. First, Defendant reasserts, as he did in his motion to dismiss, that Plaintiff's Complaint was untimely filed and that equitable tolling is unavailable to save Plaintiff's claims. (Doc. 84-1, pp. 6–13.) Defendant also claims the undisputed facts demonstrate that he did not use an excessive amount of force against Plaintiff. (Id. at p. 13.) Defendant further claims that he is entitled to qualified immunity. (Id. at p. 21.) Finally, Defendant argues that, even if Plaintiff's claims proceed, Plaintiff is entitled to no more than nominal damages because he cannot show more than a *de minimis* physical injury. (Id. at p. 23.)

## I.     Standard of Review

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. However, there must exist a conflict in substantial evidence to pose a jury question." Hall v. Sunjoy Indus. Grp., Inc., 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir. 1989)).

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that he is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the moving party

must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." See Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).

## II.  Timeliness of Plaintiff's Complaint

Constitutional claims brought pursuant to Section 1983 "are tort actions, subject to the statute of limitations governing personal injury actions in the state where the § 1983 action has been brought." Powell v. Thomas, 643 F.3d 1300, 1303 (11th Cir. 2011). In states where more than one statute of limitations exists, the forum state's general or residual personal injury statute of limitations applies to all § 1983 actions filed in federal court in that state. Owens v. Okure, 488 U.S. 235, 236, 249–50 (1989). Georgia has a two-year statute of limitations for personal injury actions. O.C.G.A. § 9-3-33.

Although state law determines the applicable statute of limitations, "[f]ederal law determines when the statute of limitations begins to run." Lovett v. Ray, 327 F.3d 1181, 1182 (11th Cir. 2003). As a general rule, "the statute of limitations does not begin to run until the

facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." Id.

Plaintiff signed his Complaint on July 17, 2014, sent the Complaint on July 24, 2014, and it was filed in this Court on July 31, 2014. (Doc. 1, p. 6.) Thus, given the two-year limitation period, the operative date for assessing the timeliness of Plaintiff's Complaint is July 24, 2012.[4] Any claims that accrued before July 24, 2012 (or for which the statute of limitations was not tolled until at least that date), are untimely. Plaintiff was aware of the facts giving rise to his claims against Defendant on June 19, 2012, the date that Defendant allegedly used excessive force against him. (Id. at p. 14.) Of course, this is before the operative date of July 24, 2012. Thus, on its face, Plaintiff's claims are untimely.

However, Plaintiff filed a grievance, which could serve to toll the statute of limitations period. "As a general matter, equitable tolling pauses the running of, or 'tolls,' a statute of limitations when a litigant has pursued his rights diligently but some extraordinary circumstance prevents him from bringing a timely action." Lozano v. Montoya Alvarez, ___ U.S. ___, 134 S. Ct. 1224, 1231–32 (Mar. 5, 2014). The Prison Litigation Reform Act ("PLRA") requires an inmate to exhaust all available administrative remedies before filing suit. 42 U.S.C. § 1997e(a).

---

[4] In Jeffries v. United States, 748 F.3d 1310, 1314 (11th Cir. 2014) the Eleventh Circuit held that "a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." The Eleventh Circuit further held that "[a]bsent evidence to the contrary, we assume that a prisoner delivered a filing to prison authorities on the date that he signed it." Id. However, Defendant maintains that Plaintiff's Complaint cannot be deemed properly filed on July 17, 2014, the date it was signed. In support of this contention, Defendant submitted a declaration by Vikki Irwin, the Deputy Warden of Administration at Smith State Prison, stating that Plaintiff submitted a request for postage on July 24, 2014—seven days after Plaintiff signed his Complaint. (Doc. 84-7, p. 2.) In his request, Plaintiff stated that he had a "dead-line on [] legal material" which he needed to meet. (Id. at p. 3.) Irwin contends that Plaintiff made no other requests for legal mail during that time period. (Id. at p. 1.) A review of Plaintiff's myriad cases in this District, as well as one in the Northern District of Georgia reveals that, while Plaintiff filed multiple documents with the courts during this time period, he filed the instant Complaint immediately after his July 24, 2014 request for postage. Additionally, Plaintiff's Complaint was notarized on July 24, 2014. (Doc. 1, p. 6.) Accordingly, there is undisputed evidence that Plaintiff's Complaint—though signed on July 17, 2014—was properly "filed" on July 24, 2014.

In Leal v. Georgia Department of Corrections, 254 F.3d 1276, 1280 (11th Cir. 2001), the Eleventh Circuit Court of Appeals "decline[d] to decide in the first instance the legal issue of whether the mandatory exhaustion requirement of 42 U.S.C. § 1997e(a) and the actual exhaustion of remedies by a prisoner will operate to toll the statute of limitations." Georgia law does not permit tolling, and the Eleventh Circuit has not addressed this issue directly. Walker v. United States, 196 F. App'x 774, 777 (11th Cir. 2006) (stating in a Bivens case that court has "declined to decide whether the statute of limitations is tolled in a § 1983 case while a petitioner is pursuing administrative remedies"). Accordingly, Defendant reasserts his prior argument, previously rejected by Judge Edenfield, that Plaintiff's pursuit of administrative remedies should not toll the statute of limitations period. (Doc. 42.) For the reasons stated in Magistrate Judge Graham's Report and Recommendation and Judge Edenfield's Order denying Defendant's Motion to Dismiss, the Court should decline to reconsider its prior determination that Plaintiff's pursuit of administrative remedies served to toll the statute of limitations. (Docs. 34, 42.)

Therefore, I conclude, as have several Courts of Appeals, that tolling should apply. Nickolich v. Rowe, 299 F. App'x 725, 725–26 (9th Cir. 2008) (finding that, given California's two-year statute of limitations, a state prisoner's Section 1983 deliberate indifference claim was not barred by the statute of limitations, where the inmate commenced his prison grievance process immediately after his claim accrued and filed a complaint within two years of completing the mandatory grievance process); Johnson v. Rivera, 272 F.3d 519, 522 (7th Cir. 2001) (holding that a federal court relying on the Illinois statute of limitations in a Section 1983 case must toll the limitations period while a prisoner completes the administrative grievance process); Brown v. Morgan, 209 F.3d 595, 596 (6th Cir. 2000) (concluding that tolling is appropriate while prisoner completes mandatory exhaustion requirements); Harris v. Hegmann,

198 F.3d 153, 157–59 (5th Cir. 1999) (same); see also Quilling v. Humphries, No. 4:10cv404-WS, 2010 WL 4783031, at *1 (N.D. Fla. Nov. 17, 2010) (referring a case back to the magistrate judge because it could not be determined that the statute of limitations necessarily barred the plaintiff's claims); and Baldwin v. Benjamin, No. 5:09-CV-372(CAR), 2010 WL 1654937 (M.D. Ga. Apr. 23, 2010) (recognizing that the Eleventh Circuit has not adopted a rule regarding the effect of exhaustion on tolling but noting that the exhaustion requirement may operate to toll the statute of limitations). Accordingly, the applicable statute of limitations period was tolled while Plaintiff pursued his administrative remedies, which was a prerequisite to filing suit because he was imprisoned at the time giving rise to his Complaint.

Having concluded that the period in which Plaintiff pursued administrative remedies equitably tolled the statute of limitations period, the crux of the parties' dispute regarding the timeliness of Plaintiff's Complaint is the date on which Plaintiff filed his initial grievance. As discussed below, in order to properly exhaust administrative remedies, Plaintiff was required to first submit an informal grievance, followed by a formal grievance. Plaintiff maintains that he filed his grievance on June 19, 2012, (doc. 88-1, p. 12), whereas Defendant contends Plaintiff filed that grievance on June 28, 2012, (doc. 84-5, p. 17). In support of his contention that Plaintiff initiated the administrative grievance procedure on June 28, 2012, Defendant has submitted a document labeled "Confidential Inmate Grievance Form" bearing Plaintiff's signature and dated June 28, 2012. (Doc. 84-5, p. 17.) However, it appears that this document represents the date Plaintiff filed a formal grievance, as Plaintiff has submitted a copy of Grievance No. 123257, which includes a receipt documenting that he submitted his informal grievance on June 21, 2012. (Doc. 88-1, p. 12.) Accordingly, based upon the documentary evidence before the court, Plaintiff's pursuit of administrative remedies commenced on June 21,

2012, the date he filed an informal grievance. Coincidentally, this date marks the beginning of the period in which the statute of limitations was equitably tolled.

Next, Defendant contends that, even if the statute of limitations is tolled during the period in which Plaintiff pursued administrative remedies, his Complaint was still untimely. Defendant contends that the administrative grievance period began on the date Plaintiff filed a formal grievance—(which Defendant contends was June 28, 2012)—and concluded on July 26, 2012, when Plaintiff received a response from the warden. (Doc. 84-1, p. 13.) However, as discussed above, Plaintiff's filing of an informal grievance on June 21, 2012 properly initiated the grievance process and tolled the statute of limitations. Because the incident giving rise to Plaintiff's claims occurred on June 19, 2012, the Georgia Department of Corrections' Standard Operating Procedure ("SOP") IIB05–0001, which was effective until December 10, 2012, provided the proper framework for Plaintiff's grievance procedure. See Henderson v. Williams, No. CV613-008, 2013 WL 3874951, at *3 n.3 (S.D. Ga. July 25, 2013) (citing former SOP IIB05–0001). This Court has explained the following timing elements of that former SOP:

> The previous version of Standard Operating Procedure ("SOP") IIB05–0001 set forth the three (3) steps an inmate must complete under the Georgia Department of Corrections' grievance procedure. First, an inmate had to file an informal grievance "no later than 10 calendar days from the date" the inmate was aware "of the facts giving rise to the grievance." An inmate was to be given a written response to his informal grievance within ten (10) calendar days of the counselor's receipt of the inmate's informal grievance. If the inmate was dissatisfied with the resolution of his informal grievance, he had to file a formal grievance within five (5) days of his receipt of the written resolution of his informal grievance. The Warden had thirty (30) days to respond. Once an inmate received the Warden's response to his formal grievance and was dissatisfied with that response, he had five (5) business days to file an appeal with the Commissioner. The Commissioner's Office had 90 calendar days after receipt of the appeal to respond. (Case No. CV612–88, Doc. No. 46).

Id.

As noted above, the record indicates that Plaintiff filed an informal grievance on June 21, 2012. (Doc. 1-1.) From this date—June 21, 2012—until the date on which Plaintiff received a response from the warden concerning his formal grievance—July 26, 2012, a period of thirty-five days passed. Accordingly, the two year statute of limitations applicable to Plaintiff's claims was tolled for at least a corresponding period of thirty-five days.[5] The events giving rise to Plaintiff's claims occurred on June 19, 2012, and Plaintiff filed his Complaint in this Court on July 24, 2014—a period of exactly two years and thirty-five days. Accordingly, Plaintiff timely filed his Complaint, albeit perhaps on the last day of the period in which his claim was equitably tolled.[6]

## III.  Eighth Amendment Claims

Plaintiff's excessive force claims and Defendant's Motion require analysis of the Eighth Amendment's proscription against cruel and unusual punishment. That proscription governs the amount of force that prison officials are entitled to use against inmates. Campbell v. Sikes, 169 F.3d 1353, 1374 (11th Cir. 1999). An excessive force claim has two requisite parts: an objective and a subjective component. Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994). In order to satisfy the objective component, the inmate must show that the prison official's conduct was "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). The subjective component requires a showing that the force was

_____

[5] It could be argued that the tolling of the statute of limitations began on the date that the incident occurred, June 19, 2012. From that date until June 21, 2012, Plaintiff was presumably pursuing his administrative remedies by preparing to file his grievance. The SOP recognized the preparation of the grievance as part of the process by giving Plaintiff up to ten days to file his grievance. However, the Court need not decide whether the time Plaintiff spent preparing the grievance should be included in the tolling period as the tolling period without such inclusion renders Plaintiff's action timely.

[6] The warden's response to Plaintiff's formal grievance indicated that his grievance had been referred to internal investigations. Defendant contends that a referral to internal investigations marks the conclusion of the grievance process and, therefore, does not appear to argue that Plaintiff failed to exhaust his administrative remedies. (Doc. 84-1, p. 5.)

used "maliciously and sadistically for the very purpose of causing harm" rather than "a good faith effort to maintain or restore discipline." Whitley v. Albers, 475 U.S. 312, 320–21 (1986). In order to determine whether the force was used for the malicious and sadistic purpose of causing harm or whether the force was applied in good faith, courts consider the following factors: the need for the exercise of force, the relationship between the need for force and the force applied, the extent of injury that the inmate suffered, the extent of the threat to the safety of staff and other inmates, and any efforts taken to temper the severity of a forceful response. Skelly v. Okaloosa Cty. Bd. of Cty. Comm'rs, 456 F. App'x 845, 848 (11th Cir. 2012) (quoting Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009)).

In this case and at this stage, as to incidents one and two, there are too many controverted material facts for the Court to find that Defendant did not use excessive force against Plaintiff. As to incident one, Defendant claims that he merely placed Plaintiff against a wall in an effort to restrain him, though he admits that "[i]t is possible that his head struck the wall." (Doc. 84-4, p. 2.) Plaintiff disputes that he physically resisted after Defendant restrained him against the wall. Plaintiff contends that Defendant purposely grabbed the back of his head and forcefully shoved his face into the wall three times. (Doc. 88, pp. 3–4.) Accordingly, Plaintiff avers that Defendant's actions constituted excessive force. As to incident two, Defendant claims that Plaintiff spat on him and was "verbally abusive" during the escort to the infirmary. (Doc. 84-1, p. 2.) In response, Defendant ordered that the officers escorting Plaintiff restrain him on the ground and place leg irons and a face mask on him. (Id.) Plaintiff denies spitting on Defendant and, therefore, claims that Defendant had him knocked to the ground and placed in restraints without any justification.[7] (Doc. 88, pp. 4–5.) Plaintiff contends that Defendant then directed

---

[7] Defendant admits that Plaintiff may not have spit on him. (Doc. 84-1, p. 18.)

the officers to kick, punch, and choke him.  (Id.)  Defendant denies knowing whether the officers also punched and kicked Plaintiff while he was on the ground.  (Doc. 84-1, p. 2.)

At this stage, it is not the Court's role to judge the credibility of Plaintiff's account versus Defendant's account.  Rather, "the Court must adopt [Plaintiff's] version of the incident for purposes of summary judgment."  Thwaites v. Wimbush, No. 5:11-CV-195 (CAR), 2013 WL 1333723, at *4 (M.D. Ga. Mar. 29, 2013).  The Court includes a full analysis of incidents one and two below.  However, put succinctly, factual disputes between Plaintiff's version of these two incidents and Defendant's account permeate the factors that the Court takes into consideration when weighing an allegation of excessive force.  As to these incidents, Defendant has not offered evidence that blatantly contradicts Plaintiff's version of events and has failed to show that no genuine dispute of material fact exists.

However, for the reasons discussed below, Defendant has shown that he is entitled to judgment as a matter of law for all claims arising from incidents three and four.  As to incident three, Plaintiff contends that, during his escort from the infirmary back to his cell, officers again forced him to the ground and dragged him down the hallway.  (Doc. 1, pp. 10–11.)  Defendant contends that Plaintiff was forced to the ground because he physically resisted officers and that Plaintiff sustained no injuries during this incident.  (Doc. 84-1, p. 3.)  As to incident four, Plaintiff contends that the handcuffs and leg irons placed upon him during his escorts were so tight he could not walk and that he sustained lacerations to his legs and wrists as a result.  (Doc. 1, p. 11.)  Plaintiff avers that his wrist lacerations were so severe that he now suffers persisting numbness and has been assigned a medical safety "handcuff in front" profile due to his injury. (Id. at pp. 11–12; Doc. 88, p. 6.)  Defendant disputes that Plaintiffs' handcuffs and leg restraints were improperly fitted or that Plaintiff has suffered more than a *de minimis* injury.  Defendant

states that he and a nurse confirmed three times that Plaintiff's restraints were not too tight. (Doc. 84-2, p. 5.)

The Court now assesses the determinative factors as to each of the four incidents of use of force against Plaintiff independently.

**A.      Incident One**

**1.      <u>The Need for the Exercise of Force</u>**

As to the need for Defendant to exercise force during the first incident, Defendant argues that Plaintiff "verbally indicated that he would not enter the new cell and physically resisted placement in the cell" by turning his back to the door.  (Doc. 84-4, p. 2.)  Plaintiff agrees that he refused to enter the cell and that he turned his body away from the cell door before Defendant pinned him to the wall.  (Doc. 84-3, p. 5.)  However, Plaintiff disputes that he displayed any resistance thereafter.  (<u>Id.</u>)  Therefore, Plaintiff contends that Defendant shoved his head into the wall without sufficient justification.  Construing these factual disputes in favor of Plaintiff, as the Court must at this stage, the jury could find that Plaintiff did not display resistance once he was secured against the wall and, therefore, there was no need for Defendant to repeatedly slam Plaintiff's head against the wall.

**2.      <u>The Relationship Between the Need for the Use of Force and the Amount Applied</u>**

There also are factual disputes as to the relationship between the need for the use of force and the amount of force applied by Defendant.  Again, the issue of the need for the use of force is unresolved due to the differences in Defendant's and Plaintiff's accounts of what occurred once Defendant secured Plaintiff against the wall.  While Defendant maintains that he merely secured Plaintiff against the wall and that Plaintiff's head may have come in contact with the wall (doc. 84-4, p. 2), Plaintiff contends that Defendant slammed his head and face against the

wall once he was secured and despite the fact that Plaintiff displayed no physical resistance (doc. 84-3, p. 5). Under Plaintiff's version of events, the jury could find that the force Defendant applied far exceeded any need for force posed by Plaintiff.

### 3. __The Extent of Injury to Plaintiff__

The extent of Plaintiff's injury also weighs against a grant of summary judgment. The extent of injury "is a relevant factor in determining whether the use of force could plausibly have been thought necessary under the circumstances and may be an indication of the amount of force applied." Logan v. Smith, 439 F. App'x 798, 800 (11th Cir. 2011) (citing Wilkins v. Gaddy, 559 U.S. 34, 37 (2010)). However, while the resulting injury can be indicative, the key inquiry is the amount of force applied by Defendant, not the severity of the injury that resulted to Plaintiff. Id. at 800–01 (citing Wilkins, 559 U.S. at 37). Injury and force are "imperfectly correlated," and "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." Wilkins, 559 U.S. at 38. Plaintiff's injuries are not so clearly contradictory that they discredit Plaintiff's version of the incident. As detailed above, according to Plaintiff and the medical evidence, he suffered a gash to the top of his head, which required medical attention. In addition, Plaintiff claims that his head injury later resulted in persistent migraines and that he bears a one-inch scar from the gash. (Doc. 84-3, p. 10; Doc. 1, p. 10.) These injuries are not so insignificant that they would prevent the jury from finding for Plaintiff on the "core judicial inquiry," that being "the nature of the force—specifically, whether it was nontrivial and 'was applied . . . maliciously and

sadistically to cause harm.'"  Wilkins, 559 U.S. at 39 (alteration in original) (quoting Hudson v.

McMillian, 503 U.S. 1, 7 (1992)).[8]

### 4.  The Extent of the Threat to the Safety of Staff and Other Inmates

Defendant argues that "Plaintiff was insubordinate and defiant of authority in refusing to

enter his new cell."  (Doc. 84-1, p. 17.)  Plaintiff does not dispute that he verbally refused to

enter the cell.  Nevertheless, construing the facts in the light most favorable to Plaintiff, the jury

could find that Plaintiff posed little if any threat to the safety of staff and other inmates.  At the

time that Defendant slammed Plaintiff's head against the wall, Plaintiff's hands were in

handcuffs behind his back, his body was secured against the wall, and he was surrounded by

additional correctional officers.  (Doc. 1, p. 8.)  While the need to place inmates in cells is, of

course, a legitimate security interest, in this case, the jury could find that Plaintiff did not pose a

threat to that interest and that force was not employed to address that interest.

### 5.  Any Efforts Taken to Temper the Severity of a Forceful Response

It is undisputed that, minutes after the incident, Plaintiff was taken to the medical unit

and given an evaluation.  Nevertheless, because the preceding four factors weigh in Plaintiff's

favor, the Court should deny Defendant summary judgment on his arguments that he did not use

an excessive amount of force against Plaintiff during incident one.

### B.  Incident Two

### 1.  The Need for the Exercise of Force

Defendant argues that he had Plaintiff placed in leg restraints and a face mask during his

escort to the infirmary because Plaintiff "seemed to spit" on him.  (Doc. 84-1, p. 18.)  However,

Plaintiff denies spitting on Defendant.  (Doc. 84-3, p. 6.)  Construing these disputes in favor of

---

[8]  As the Court noted in Wilkins, while the minor injuries Plaintiff suffered do not require a finding that
the force used against him was not excessive, "the relatively modest nature of his alleged injuries will no
doubt limit the damages he may recover."  559 U.S. at 40.

Plaintiff, as the Court must at this stage, and taking into account Defendant's own uncertainty as to whether Plaintiff spit on him, the jury could find that Plaintiff did not spit on Defendant during the escort and, therefore, there was no need for Defendant to use force against Plaintiff.

**2.  The Relationship Between the Need for the Use of Force and the Amount Applied**

There also are factual disputes as to the relationship between the need for the use of force and the amount of force applied by Defendant.  Again, the issue of the need for the use of force is unresolved due to the differences in Defendant's and Plaintiff's accounts as to whether Plaintiff spit on Defendant.  Moreover, Defendant and Plaintiff also offer very different accounts of what occurred once Defendant applied force.  While Defendant maintains that he is unaware whether the officers he ordered to restrain Plaintiff also kicked, punched, and choked him, (doc. 84-4, p. 2), Plaintiff contends that Defendant ordered the officers to exert this additional force upon him (doc. 88, p. 5).  Under Plaintiff's version of events, the jury could find that the force Defendant ordered the officers to apply far exceeded any need for force.

**3.  The Extent of Injury to Plaintiff**

The extent of Plaintiff's injury weighs more heavily in Defendant's favor than the other factors.  However, again, Plaintiff's injuries are not so clearly contradictory that they discredit Plaintiff's version of the incident.  As detailed above, according to Plaintiff, he suffered bruises and swelling as a result of the officers' alleged punching, kicking, and choking him.  (Doc. 88, p. 4.)  These injuries are not so insignificant that they would prevent the jury from finding for Plaintiff on the "core judicial inquiry," that being "the nature of the force—specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'"  Wilkins, 559 U.S. at 39 (alteration in original) (quoting Hudson, 503 U.S. at 7).

**4.  The Extent of the Threat to the Safety of Staff and Other Inmates**

Construing the facts in the light most favorable to Plaintiff, the jury could also find that Plaintiff posed little, if any, threat to the safety of staff and other inmates during his escort to the infirmary.  While the need to prevent Plaintiff from spitting on correctional officers is a legitimate security interest, in this case, the jury could find that Plaintiff did not spit on Defendant.  Therefore, the jury could find that Plaintiff did not pose a threat to the security interest and that force was not needed to address that interest.  Moreover, at the time that Defendant ordered that Plaintiff be taken to the floor and further restrained by leg irons and a face mask, Plaintiff's hands were in handcuffs behind his back, and he was being escorted by multiple correctional officers.  Additionally, Defendant does not allege that other staff members or inmates were present in the hallway.

**5.  Any Efforts Taken to Temper the Severity of a Forceful Response**

As with the other factors, factual disputes pervade any inquiry into efforts taken to limit the severity of a forceful response.  Plaintiff contends that Defendant not only ordered that he be taken to the ground and restrained by leg irons and a face mask, but that Defendant then directed the correctional officers to kick, punch, and choke him.  (Doc. 84-3, p. 6.)  Defendant does not dispute that other officers kicked, punched, or choked Plaintiff but instead states he "was not aware that any additional force was used." (Doc. 84-4, p. 2.)  Defendant argues that he used only enough force to prevent Plaintiff from spitting again and denies that he directed officers to punch or kick Plaintiff.  As it is not the Court's role to judge the credibility of Plaintiff's account versus Defendant's account, the factual dispute weighs against a finding in Defendant's favor on this factor as to incident two.

## C.    Incident Three

### 1.    <u>The Need for the Exercise of Force</u>

As to the need for Defendant to exercise force during Plaintiff's escort back to his cell from the infirmary, Defendant argues that "Plaintiff 'got physical' and 'snatched away' from the escorting officers, requiring the officers to restrain his legs and arms.  (Doc. 84-1, p. 19.) Defendant contends that officers had to then drag Plaintiff down the hallway because he refused to walk.  Plaintiff does not directly dispute that he tried to break free from the officers during this escort but avers that, because Defendant allowed his leg restraints to be so tightly fitted, he was unable to walk down the hallway.  (Doc. 84-3, p. 6.)  Based upon the undisputed facts, there was initially a need for Defendant to use force against Plaintiff by placing leg restraints on him in order to prevent him from leaving the officers' presence.  The facts further establish that, whether Plaintiff was dragged because he could not walk or because he refused to walk, there was a need for force to relocate him from the hallway to his cell.

### 2.    <u>The Relationship Between the Need for the Use of Force and the Amount Applied</u>

The Court should also resolve the issue of the need for the use of force and the amount of force applied during incident three in Defendant's favor.  Plaintiff has not directly disputed that he resisted the officers during this escort and has failed to present facts showing that Defendant applied more force than necessary to secure him and relocate him from the hallway to his cell. Accordingly, based upon Defendant's undisputed account of the events transpiring during Plaintiff's escort back to the cell, this factor weighs in favor of granting Defendant's motion for summary judgment as to incident three.

### 3. The Extent of Injury to Plaintiff

The extent of Plaintiff's injury also weighs in favor of Defendant. Defendant contends that Plaintiff was not injured when the officers took him to the ground, nor when he was dragged down the hallway. (Doc. 84-2, p. 4.) Plaintiff does not dispute that he suffered any injury from the takedown or from being dragged down the hallway.[9]

### 4. The Extent of the Threat to the Safety of Staff and Other Inmates

The fourth factor also weighs in favor of Defendant. At the time that Plaintiff was dragged down the hallway, Plaintiff's hands were in handcuffs behind his back, and he was surrounded by correctional officers. However, inherent security risks exist from an inmate that attempts to snatch away or break free from correctional officers. Additionally, inmates pose a threat to the safety of themselves, other inmates, and correctional officers when they refuse to return to their cells. Thus, even construing the facts in the light most favorable to Plaintiff, he posed a threat to the safety of staff and other inmates.

### 5. Any Efforts Taken to Temper the Severity of a Forceful Response

As with factors one (1) through four (4), this factor also weighs in favor of Defendant. Whether Plaintiff refused to walk or was unable to walk because his leg restraints were fitted too tightly, the fact that Plaintiff sustained no injuries from being dragged down the hallway indicates that Defendant likely made efforts to temper the severity of force. Accordingly, because these five factors weigh in Defendant's favor as to incident three, the Court should grant Defendant's Motion for Summary Judgment as to all claims arising out of this incident.

---

[9] Plaintiff argues that he sustained lacerations to his legs and wrists during this use of force. However, those injuries are addressed in Plaintiff's fourth claim of excessive force, discussed below.

**D.      Incident Four**

**1.      <u>The Need for the Exercise of Force</u>**

Plaintiff's fourth claim of excessive force concerns the manner in which Defendant secured his handcuffs and leg restraints during incidents one (1) through three (3).  Plaintiff contends the restraints were so tight that he suffered lacerations to his wrists and ankles, experienced massive swelling, and has persistent numbness in his hands as a result of his injuries.

Defendant had an obvious need to restrain Plaintiff's hands and legs.  Plaintiff was first being escorted from one building in the prison to another and then, from his cell to the infirmary and back.  These movements around a prison involve patent safety risks to inmates and staff.  Additionally, during these movements, Plaintiff encountered medical staff and others not trained in security to the level of correctional officers.  (Doc. 84-2, pp. 2–5.)  Additionally, the parties do not dispute that at the beginning of incident one, Plaintiff refused to enter his cell and turned his body away from the cell door.  The parties also do not dispute that Plaintiff later attempted to "snatch away" from Defendant and other correctional officers after he received treatment in the infirmary.  Accordingly, even construing the facts in a light most favorable to Plaintiff, there appears to have been a need for Defendant to use force against Plaintiff by restraining his hands and feet in order to prevent him from harming other inmates and officers and to induce him to comply with the officers' orders.

**2.      <u>The Relationship Between the Need for the Use of Force and the Amount Applied</u>**

The parties do not credibly dispute any material fact as to the relationship between the need for the use of force and the amount of force applied.  Though Plaintiff and Defendant disagree as to whether the restraints were too tight, the parties agree that a nurse checked

Plaintiff's restraints on two occasions and confirmed they were sufficiently loose. (Doc. 84-3, p. 7.) Based upon this undisputed fact, a jury could not find that the amount of force Defendant applied exceeded the need for the use of force to the point of being applied maliciously and sadistically for the very purpose of causing harm. Accordingly, even construing the facts in a light most favorable to Plaintiff, this factor weighs against Plaintiff.

### 3.  __The Extent of Injury to Plaintiff__

The extent of Plaintiff's injury also weighs against Plaintiff. As discussed above, Plaintiff claims he sustained lacerations on his wrists and ankles, developed persisting numbness in his hands, experienced excessive swelling, and he was given a "handcuff in front" medical profile as a result of his wrist injuries. (Doc. 1, p. 11.) Even these "actual injuries" are not so significant to tilt the "core judicial inquiry," that being "the nature of the force—specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm'" in Plaintiff's favor. Wilkins, 559 U.S. at 39 (alteration in original) (quoting Hudson, 503 U.S. at 7). Courts have frequently noted that similar injuries resulting from the application of handcuffs or leg restraints do not support an Eighth Amendment violation. See, e.g., Cunningham v. Culliver, No. CIV.A. 10-00114-CG-M, 2011 WL 6092431, at *10 (S.D. Ala. Nov. 14, 2011) (concluding that tissue swelling and wrist pain from handcuffing were "minor injur[ies]" that do "not support a finding that Plaintiff was subjected to anything other than *de minimis* force."); Johnson v. City of New York, 2011 WL 1044852, at *6 (S.D.N.Y. 2011) ("[T]his Court concludes that the alleged conduct involving tightly fastened handcuffs is not sufficiently serious or harmful enough to be actionable.").

## 4. __The Extent of the Threat to the Safety of Staff and Other Inmates__

The parties' pleadings indicate that Plaintiff posed at least some threat to safety of the other inmates and officers as well as the orderly operation of the prison warranting the application of handcuffs and leg restraints. Again, all of the above incidents involved Plaintiff being moved throughout the prison. It is by no means unusual, and in some situations required, to restrain an inmate when transferring him within a prison.[10] Additionally, at one point, Plaintiff resisted being moved into his new cell, and at another he attempted to break away from officers. Thus, this factor indisputably weighs in Defendant's favor as to the application of handcuffs and leg restraints.

## 5. __Any Efforts Taken to Temper the Severity of a Forceful Response__

This factor weighs heavily in favor of Defendant. Defendant contends, and Plaintiff does not dispute, that he checked to ensure that Plaintiff's restraints were not too tight and that a nurse confirmed twice that the restraints were not too tight. (Doc. 84-2, p. 5.) Therefore, regardless of whether Plaintiff ultimately sustained lacerations to his wrists and ankles, the undisputed facts show that Defendant made efforts to temper the severity of the force applied by repeatedly checking the tightness of Plaintiff's restraints.

Accordingly, even construing the facts in a light most favorable to Plaintiff, he has failed to demonstrate that Defendant applied handcuffs and leg restraints to him maliciously and sadistically to cause harm. For these reasons, the Court should grant Defendant summary judgment on his arguments that he did not use an excessive amount of force against Plaintiff during incident four.

---

[10] To this point, the fact that Plaintiff was restrained tilted this factor in Plaintiff's favor as to incidents one and two above.

To be clear, I am not recommending that the Court prevent Plaintiff from offering any evidence regarding the handcuffing of his hands and restraint of his feet. Specifically, when testifying to the jury as to incidents one and two, he will necessarily need to testify about the restraint and positioning of his hands and feet during those incidents. In addition, to the extent that Plaintiff claims he suffered injuries to his hands during incidents one and two, he should be permitted to offer evidence of those injuries.

## III.    Qualified Immunity

Defendant maintains that he is entitled to qualified immunity from Plaintiff's claims. (Doc. 84-1, p. 21.) The law governing whether a government official is entitled to qualified immunity is well established in the Eleventh Circuit. Qualified immunity protects government officials performing discretionary functions from suit in their individual capacities, so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). A government official "must first prove that he was acting within his discretionary authority." Id. at 1234; see also Ray v. Foltz, 370 F.3d 1079, 1081–82 (11th Cir. 2004). "A government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185 n.17 (11th Cir. 1994). Once the government official has shown that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity. Gonzalez, 325 F.3d at 1234 (citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)). The Supreme Court has established a two-part test to determine the applicability of qualified immunity: First, the court

must determine whether the plaintiff's allegations, if true, establish a constitutional violation. Hope, 536 U.S. at 736. If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001); Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

As laid out in detail above, Plaintiff's allegations, if true, establish constitutional violations against Defendant as to incidents one and two. Moreover, the rights that Plaintiff alleges Defendant violated during those incidents are clearly established. In the Eleventh Circuit, "a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force 'maliciously and sadistically to cause harm' is clearly established to be a violation of the Constitution by the Supreme Court . . . . There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation." Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (citations omitted) (citing Johnson v. Breeden, 280 F.3d 1308 (11th Cir. 2002)).

The Court is not concluding today that Defendant indeed used unjustified force. On the record before the Court, we cannot know. However, if the Court construes the factual disputes in favor of Plaintiff, as it must, then the actions that Defendant allegedly took, as to incidents one and two, were, "in the light of the preexisting law—beyond what the Constitution would allow under the circumstances." Pourmoghani–Esfahani, 625 F.3d 1313, 1317 (11th Cir. 2010). For these reasons, the Court should refuse to grant Defendant summary judgment based on qualified immunity as to incidents one and two.

# IV.    *De Miminis* Physical Injury Under the Prison Litigation Reform Act ("PLRA")

Defendant contends that Plaintiff is entitled to, at most, nominal damages because he suffered *de miminis* physical injuries.  (Doc. 84-1, p. 23.)  The PLRA, in pertinent part, provides: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  This section of the PLRA requires a damages recovery for mental or emotional injury to be connected to a physical injury.  Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1312–13 (11th Cir. 2002).  The physical injury must be more than *de minimis* in order to avoid the application of Section 1997e(e).  Id. at 1313.  However, the Eleventh Circuit has noted that "[t]he meaning of the phrase 'greater than *de minimis*,' however, is far from clear."  Chatham v. Adcock, 334 F. App'x 281, 284 (11th Cir. 2009).

Defendant emphasizes that Plaintiff only received "a few lacerations and a little bruising and swelling" as a result of Defendant's use of force.  (Doc. 84-1, p. 23.)  However, as laid out above, Plaintiff disputes this characterization of his injuries and states that in addition to the lacerations, he also suffered lasting effects including swelling, persisting numbness in his hands, and recurring migraines.  Other courts have found that injuries similar to those alleged by Plaintiff to be adequate to recover under the PLRA.  See, e.g., Munn v. Toney, 433 F.3d 1087, 1089 (8th Cir. 2006) (holding that plaintiff's allegations of headaches, cramps, nosebleeds, and dizziness, resulting from denial of prescribed blood pressure treatment, survived Section 1997e(e) review); Cotney v. Bowers, No. 2:03-CV-1181-WKW, 2006 WL 2772775, at *7 (M.D. Ala. Sept. 26, 2006) (finding that plaintiff's allegations of bruised ribs after use of force

surmounted Section 1997e(e)'s bar, as plaintiff put forth evidence from which a jury could determine that his physical injuries were more than *de minimis*).

Given the factual disputes regarding the injuries that Plaintiff received from Defendant's use of force, the Court should not conclude as a matter of law that Plaintiff's injuries were *de minimis*. Therefore, the Court should deny Defendant's arguments on this front as well.

## CONCLUSION

Based on the foregoing, I **RECOMMEND** that the Court **GRANT IN PART** and **DENY IN PART** Defendant's Motion for Summary Judgment (doc. 84). The Court should **GRANT** Defendant's Motion for Summary Judgment as to Plaintiff's excessive force claims regarding incidents three (3) and four (4). However, the Court should **DENY** Defendant's Motion for Summary Judgment as to Plaintiff's excessive force claims regarding incidents one (1) and two (2). Likewise, the Court should **DENY** Defendant's Motion for Summary Judgment based on the untimely filing of Plaintiff's Complaint, qualified immunity, and *de miminis* physical injury under the PLRA.

The Court **ORDERS** any party seeking to object to this Report and Recommendation to file specific written objections **within fourteen (14) days** of the date on which this Report and Recommendation is entered. Any objections asserting that the undersigned failed to address any contention raised in the Complaint must also be included. Failure to do so will bar any later challenge or review of the factual findings or legal conclusions herein. See 28 U.S.C. § 636(b)(1)(C); Thomas v. Arn, 474 U.S. 140 (1985). A copy of the objections must be served upon all other parties to the action. The filing of objections is not a proper vehicle through which to make new allegations or present additional evidence.

Upon receipt of objections meeting the specificity requirement set out above, a District Judge of this Court will make a de novo determination of those portions of the report, proposed findings, or recommendation to which objection is made and may accept, reject, or modify in whole or in part the findings or recommendations herein. Objections not meeting the specificity requirement set out above will not be considered by a District Judge. The Clerk of Court is **DIRECTED** to serve a copy of this Report and Recommendation upon the parties.

**SO ORDERED** and **REPORTED and RECOMMENDED**, this 22nd day of June, 2016.

R. STAN BAKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA